## Costello Estate

*James K. Baker* and *William Lee Akers*, for accountant and claimant.

*Roy Pressman*, p.p.

*Alfred D. Whitman*, for Commonwealth.

*Fitzhugh Lee Styles*, for claimants.

LEFEVER, J., February 26, 1962.—Isaiah A. Costello died on November 15, 1958.

The first and final account of his administratrix shows that his estate consists of two pieces of Philadelphia real estate, valued at $3,000 each, and net per-

sonal property and income from realty, after deducting disbursements, of $1,258.89. In short, the account shows a net estate of $7,258.89.

Decedent, as well as several of the claimants, regarded sex relations with complete casualness and irresponsibility. It is not surprising, therefore, that the claimants to this estate consist of two alleged widows; two alleged illegitimate sons; a niece whose legitimacy and relationship are questioned; issue of alleged brothers and sisters whose relationship is disputed, and one of decedent's "girl friends."

As is not uncommon where there is a possible windfall, claimants have exhibited uncompromising bitterness and rancor in their struggle to obtain decedent's modest estate. Some of their contentiousness has infected counsel. Five hearings have been held by the court. Voluminous testimony and other evidence have been presented.

Decedent was born in Savannah, Ga., about 1887. At an early age, he moved to Jacksonville, Fla. On July 3, 1907, he was married to Carrie Dowdell by formal ceremony. Decedent and claimant, Carrie Dowdell Costello, lived and cohabited together in Jacksonville, Fla., from the date of their marriage until sometime during World War I, when decedent obtained a war job in Philadelphia. About a year thereafter, Carrie Costello joined him in Philadelphia, where she lived with him for a year or two. Then, because decedent's job was in jeopardy owing to lessening demand for labor, his wife, at his direction, returned to Jacksonville, Fla., to set up a home for them there. When claimant left, decedent promised to join her shortly in Florida. He made similar promises by letters over a period of a year or two, but he did not return to Jacksonville. Finally, he wrote her that he had found a "lady friend" in Philadelphia, and that he would not return to Florida to live with his wife.

Decedent lived for various periods of time with a succession of women, including, inter alia, Alberta Johnson, Margaret Hodges "Costello", and Helen Huff. Illegitimate sons, David "Costello" Johnson and Frank "Costello" Johnson, never formally acknowledged, were apparently the produce of the first meretricious relationship.

After decedent's death, Vivian Downs, the alleged niece of decedent, retained Roy Pressman, Esq. He applied for letters of administration. These letters were granted to her on November 24, 1958. Sometime thereafter, she became dissatisfied with Mr. Pressman's representation. She discharged him and retained James K. Baker, Esq., as her attorney. Finally, William Lee Akers, Esq., joined Mr. Baker as her counsel.

Mr. Pressman stated in open court that Vivian Downs had delivered to him a holographic will which she told him decedent had executed shortly before his death. At the direction of the court, Mr. Pressman lodged this document with the register of wills. Vivian Downs testified that the document lodged with the register was not the document she delivered to Mr. Pressman and that the signature thereon was a forgery.

Considerable evidence was offered to prove that Rufus Costello, Marion Ingram, Carrie Valdaze, Harriett Costello McMorris, Benjamin H. Costello, Jr., Eugene Costello and Pearl L. Costello Smith, are nephews, nieces, grandnephews and grandnieces of decedent, and to substantiate the claim of Helen Huff.

The auditing judge will consider seriatim the various claims.

1. *Claim of David "Costello" Johnson and Frank "Costello" Johnson.*

It would appear that David "Costello" Johnson and Frank "Costello" Johnson are the illegitimate sons of

decedent by Alberta Johnson. The Philadelphia Municipal Court records indicate that a support order was entered against decedent on this premise. Moreover, David lived in decedent's household for a period of time, and decedent apparently regarded him with some affection. However, decedent never formally acknowledged these two claimants as his sons, nor did he formally adopt them.

Under section 7 of the Intestate Act of 1947, illegitimate children do not inherit through their father. Accordingly, the claims of David "Costello" Johnson and Frank "Costello" Johnson are disallowed.

### 2. *Claim of Vivian Downs.*

A marriage license (accountant's exhibit no. 5), disclosed that Albert George Downs and Mary Martha Costello were married by formal ceremony performed by Rev. D. M. Baxter on July 11, 1910, in Duval County, Fla. The birth certificate of Vivian Earthaline Downs (accountant's exhibit no. 4), shows that she was born on July 25, 1911, at 401 Jackson Street, Jacksonville, Fla.; that her father was George Albert Downs, and that the "name of mother before marriage" was "Mary Costello."

The death certificate of Mary Downs (accountant's exhibit no. 6), indicates that Mary Downs died in Jacksonville, Fla., on February 20, 1912, of tuberculosis; that the place of burial was Savannah, Ga., and that her father's name was Alexander Costello (the name of our decedent's father).

Three witnesses called by claimant, namely, Mrs. Nellie Davis, of 910 North Avenue, Atlantic City, N.J., Clarence Green, of 703 South Twenty-first Street, Philadelphia, and Mrs. Lucy Powell, of 2343 Sharswood Street, Philadelphia, testified that decedent had stated to them upon frequent occasions that Vivian Downs was his niece, that she was the daughter of

Mary Downs (decedent's sister), although occasionally decedent referred to her as "his daughter" because he had raised her from infancy following the death of Mary Downs. The first two witnesses had known decedent and Vivian in Florida; the third witness had only known them in Philadelphia. Mrs. Louise M. Robinson, of Jacksonville, Fla., a witness called by adverse claimants, admitted on cross examination that Mary Downs and decedent were sister and brother, and that Vivian was Mary's daughter.

The census records of 1900 show the residents of 2222 Bullock Street, Savannah, Ga., to be Mary Costello, head of the household, and Isaiah Costello, son, aged 12, born October, 1887 in Georgia, and Mary, the daughter, aged 8, born June 1892 in Georgia (accountants' exhibits no. 7 and no. 8).

Vivian Downs testified unequivocally that her relationship to decedent was niece, her mother, Mary Downs, being decedent's sister. She also testified that decedent sometimes referred to her as "daughter" bcause he had raised her from infancy and because she regarded him as a father. On cross-examination, Vivian Downs admitted that she lived for some time with a man named Copeland; that she was never married; that she used his name and was known as Vivian Downs Copeland, and that she had left him about 20 years ago.

The auditing judge is completely satisfied from the proofs presented, and finds as facts, that Mary Downs and decedent were brother and sister; that Vivian Downs is the legitimate child of Mary Downs, and that, as such, Vivian Downs is the niece of decedent.

3. *Claim of Rufus Costello, Marion Ingram, Carrie Valdaze, Harriett Costello McMorris, Benjamin H. Costello, Jr., Eugene Costello, and Pearl Costello Smith*

A number of witnesses were called in an effort to show that decedent had brothers and sisters in addi-

tion to Mary Downs. Their testimony was vague, conjectural, contradictory and hopelessly conflicting. Much of the testimony was hearsay of the most objectionable kind, or a vague recollection of a casual statement made by someone years ago about decedent or the relationship of someone to him. Several of the witnesses refuted and impeached each other's testimony. The best that counsel could draw from these witnesses was an affirmative answer to improper leading questions, or a conjecture as to crucial links in the chain of alleged relationships. Per contra, Rufus Costello, one of these claimants, who was also represented by Mr. Styles and who did *not* appear in court, wrote to Vivian Downs that his relationship to decedent was that of *cousin—not nephew* (accountant's exhibit no. 10). Rufus included a full family tree, showing that decedent's father and Rufus' father were brothers, making Rufus a cousin of decedent. Rufus also stated in his letter that decedent and Mary Downs were brother and sister, and that they had no brothers and sisters. These admissions by claimant Rufus are conclusive as far as he is concerned. Moreover, most of the witnesses claimed the same relationship to decedent as he. Several important witnesses testified that they obtained their basic information as to relationships from Rufus. Rufus was the key link in the chain of relationship. The mathematical axiom "things equal to the same thing are equal to each other" applies.

In addition to the absence of positive proofs of the alleged relationship, there was considerable evidence introduced to the effect that decedent and Mary Downs had frequently stated to the witnesses who were in court that they were sister and brother, and that they had no other sisters or brothers.

It is not necessary for the auditing judge to decide whether or not these claimants were related to decedent as cousins. Assuming arguendo that they were

cousins, they would not be entitled to share in this estate in view of the above ruling that Vivian Downs is the niece of decedent. A niece takes to the exclusion of cousins under the Intestate Act of 1947.

After careful review of the evidence and thorough consideration of the brief filed by their counsel, the auditing judge decides that these claimants are not entitled to take any share.

## 4. *Claim of Margaret Hodges Costello*

Margaret Hodges Costello filed claims against the estate (1) as widow of decedent, and (2) for $1,050 contribution to the mortgage secured upon premises 1735 North Twenty-third Street, Philadelphia, which had been registered in her name and that of decedent as tenants by the entireties.

### (a) Claim as Widow

Claimant failed to produce any evidence that decedent and Carrie Costello were divorced. It is axiomatic that decedent could not contract a valid marriage with claimant so long as his marriage to Carrie Costello continued. Therefore, it is unimportant whether or not claimant and decedent went through a formal marriage ceremony.

The auditing judge rules that Margaret Costello was not the lawful wife of decedent. Hence, she has no widow's rights.

### (b) Claim for $1,050

On June 16, 1930, the house and property, 1735 North Twenty-third Street, Philadelphia, was conveyed to "Isaiah A. Costello and Margaret, his wife, as tenants by entireties." "At Isaiah Costello's death, there existed a mortgage on the premises . . . secured by a bond on which Isaiah and Margaret were jointly and severally liable. The outstanding balance at Isaiah's death was $2,100. Subsequently, Margaret

paid the mortgage in full and the same was satisfied of record . . ." "Counsel for the accountant is of the opinion that the said claim is valid in law . . ." (Stipulation of counsel, filed February 13, 1962).

It is clear, by reason of the words "as tenants by entireties" in the granting clause, that claimant, although not decedent's wife, became the sole owner of this property at decedent's death as the surviving tenant under a joint tenancy with right of survivorship: Maxwell v. Saylor, 359 Pa. 94; Bove v. Bove, 394 Pa. 627. Where tenants by entireties are jointly liable on a bond and mortgage on real property and the surviving tenant pays the balance due, she is entitled to contribution from deceased tenant's estate of one-half of said unpaid balance: Dowler Estate, 368 Pa. 519. This situation is analagous to the instant case. As pointed out in Kershaw Estate, 352 Pa. 205, 207: ". . . Prima facie the payment of an indebtedness by one of two or more joint obligors is for the benefit of all, and the one making the payment is therefore entitled to contribution from the others. . . ."

Accordingly, the claim of Margaret Hodge Costello, now Margaret Greaves, is allowed in the amount of $1,050.

### 5. *Claim of Carrie Costello*

It is clear from the testimony of Carrie Costello and other witnesses that she was married to decedent by a formal ceremony on July 3, 1907, in Jacksonville, Florida. This testimony is fortified by the actual marriage certificate, photostatic copy of which is in the record (accountant's exhibit no. 1).

No evidence has been introduced to show a divorce severing the marriage between decedent and claimant. On the contrary, claimant testified unequivocally that she never brought an action for divorce, and that she never received any notice of divorce proceedings instituted by decedent.

The auditing judge rules that claimant was married to decedent at the time of his death.

Did claimant forfeit her rights in decedent's estate under the Intestate Act?

Uncontradicted evidence demonstrates that decedent deserted claimant. Decedent requested claimant to leave their Philadelphia home and to set up a home for them in Jacksonville, Florida. Decedent promised to join claimant there as soon as he lost his job in Philadelphia. Claimant set up the suggested home in Florida. Claimant repeatedly requested decedent to come and live with her in this home in Florida. Decedent repeatedly promised to do so, but he never complied with his promise. Finally, decedent frankly informed claimant that he had acquired a new "lady friend" and that he would never return to live with claimant.

Thereafter, claimant wrote many letters to decedent which were returned unopened. She received no further word from decedent.

Claimant waited in vain for decedent for many years. Finally, years after decedent's desertion, claimant took up an abode and cohabited with Stephen Thompson in a meretricious relationship. This continued for several years. The record is not clear as to the exact dates of this relationship. It was apparently about 1950.

Claimant's relationship with Thompson was improper. However, it occurred more than 30 years after decedent had deserted her, had himself lived in meretricious relationship with a succession of women, had sired illegitimate children, had failed to support claimant and had completely violated all of his marital obligations to her.

In Crater Estate, 372 Pa. 458, 460, it was stated:

"The burden of proof was upon the heirs to establish their allegation that the wife was guilty of wilful and malicious desertion: Estate of Mehaffey, 102

Pa. Superior Ct. 228, 234; Schreckengost's Estate, 77 Pa. Superior Ct. 235, 237. But, upon proof of the wife's adultery during the separation, the inference justifiably arose that her open disregard of her marital obligations was intentional and, as a consequence, a wilful and malicious desertion by her. 'If, after separation, the wife commits adultery, the separation from that time on becomes desertion within the meaning of the act [of June 7, 1917, P. L. 429]. It deprives her of all interest in the estate': Bowman's Estate, 301 Pa. 337, 340, 152 A. 38. See also Lodge's Estate, 287 Pa. 184, 187-188, 134 A. 472. In that situation, the burden of going forward with evidence to prove that the separation was originally the fault of the husband shifted to the wife. Her subsequent adultery would not operate to bar her claim against his estate if the husband was in fact the one responsible for the separation. 'Where such is the case there is sound public policy to protect the widow because "His own crime of unfaithfulness to his marriage vows exposed her to seduction, and that she fell was as much his fault as hers": Reel v. Elder [62 Pa. 308], at 317': Archer Estate, 363 Pa. 534, 538, 70 A. 2d 857."

In the instant case, the heirs have not met the burden of proving that the widow, Carrie Costello, deserted decedent. Per contra, the widow has proved to the complete satisfaction of the auditing judge that decedent deserted her and lived in open adultery with a succession of women. Only after the widow had waited in vain for the return of her husband, for a period of almost 30 years, did she enter into a meretricious relationship with Thompson.

A husband cannot relieve himself of his marital obligations by deserting his wife and following a consistent pattern of adultery with a succession of women for 30 years, and then cry "Shame!" to his deserted wife when she thereafter follows his example.

The auditing judge rules that the widow, Carrie Costello, by her conduct has not forfeited her intestate rights in decedent's estate.

The auditing judge is fortified in this conclusion by the fact that Vivian Downs, decedent's niece (who would be entitled to decedent's entire estate if the widow, Carrie Costello, were disqualified), has taken the position that Carrie Costello is entitled to a widow's intestate share in decedent's estate. Vivian Downs took this position by requesting in her statement of proposed distribution that the court award to Carrie Costello her full intestate share as the lawful widow of decedent. Vivian Downs and her counsel confirmed this position in open court.

Award will be made to Carrie Costello of her widow's share under the Intestate Act.

## 6. *Disputed Will*

The holographic will dated April 29, 1958 (Pressman exhibit no. 1), presents an amazing situation.

Roy Pressman, Esq., a member of the bar of this court, testified that Vivian Downs gave him this document, stating that it was signed by decedent. Vivian Downs testified that her uncle wrote a holographic will, but that the document produced by Mr. Pressman is not it. Vivian Downs would receive greater benefits by the terms of the disputed document if it were a valid will than under the Intestate Act. Nonetheless, she testified that the signature thereupon was not decedent's.

Pursuant to the direction of the auditing judge, this document has been for many months lodged with the register of wills. Nonetheless, no one has taken steps to probate it as a will, nor to revoke the letters of administration. More than the statutory two years have elapsed since decedent's death. Moreover, Vivian Downs for herself and Carrie Costello, and Helen Huff,

under oath in open court, expressly waived any rights they had, or might have, under this document.

Accordingly, the auditing judge will disregard it and make awards under the Intestate Act. . . .

And now, February 26, 1962, the account is confirmed nisi.